The next case is Sansotta v. Town of Nags Head. Mr. Bramer. Nice to see you. You as well. May it please the court. Well, we're not dealing with abstention in this appeal. We have three constitutional claims before you. A procedural due process claim, an equal protection claim, and a federal takings claim. All arising from the town's order that the property owners in this case remove their homes or demolish them. Denial of permits, categories of denials, by the way, including CAMA permits, and fines for every day the property owners refuse to remove their homes. Two of the claims, the procedural due process and equal protection claims, are before you on the merits on summary judgment. The federal takings claim is before you on a ripeness issue concerning whether the claim was ripe in federal court after the defendants removed it. Why is it ripe? Why is it ripe, Mr. Bramer? Why is it ripe? The federal claim is ripe because they removed the claim and waived. One reason is because they removed the claim and they didn't raise Williamson County for a significant period, a year. And by doing so, they waived the benefit of being able to claim the prudential ripeness requirement that you litigate in state court before you come to federal court. And the basis for that is, again, as I mentioned, that Williamson County is a prudential rule. It's not a jurisdictional rule. And so if you agree with the district court, as the town does, that the federal takings claim can be dismissed after removal and then significant litigation, you're setting up a system where, as in the Telosco case, we have nowhere to go. Property owners have nowhere to go with their federal takings claim. They go to state court. I'm sorry, I'm not following you. Maybe you could start over a little bit. OK. If you agree with the district court, as the town does, the system that they're arguing for. Well, we don't have to agree with the district court. The question is, is the takings claim ripe? Yes. OK. That was the question that Judge Shedd asked. Yes. And the district court said it's not right. The district court said it's not right. And it was wrong because it didn't take into account that once it was removed and then there was significant, the town ceded to federal jurisdiction, and there was significant federal jurisdiction on this claim, this claim became ripe in the federal court because the issues became fit and the hardship and the fairness to the parties congealed, if I may, to where the claim became ripe and it should have been stayed in the federal court. If it doesn't stay in the federal court, then there is no forum for a property owner. If it doesn't stay in the federal court, the court remands it. Well, the court dismissed it. I understand the court dismissed it, but perhaps the court should have simply remanded the takings claim. Wouldn't that have been the more appropriate procedural way to handle it? I don't think it would be appropriate. I mean, it's better than a dismissal, I guess, as a practical matter, but it's not appropriate legally. There's no basis for remand. There's jurisdiction. Everybody agrees that there's jurisdiction. That's one reason. And the second reason is that remand is going to set up a system where you're going to say, government, you can jerk a plaintiff back and forth before courts, drain their resources, and that's how ripeness works. It's sort of a shell game. You can't go to state court because we can remove you. I guess I'm just not following that. You brought two freestanding constitutional claims, right? And takings claim. Am I right? Yeah, there is actually. There are others, but those are the three before us. Correct. The town removed the case and challenged the ripeness of the takings claim, right? After a year. They did. And so what's the significance of after a year? Well, because we filed correctly in state court. They remove us and say, federal court, you have jurisdiction because the takings claim is a federal question. Then it gets litigated. They didn't say because the takings claim is a federal question. They said these other claims. Respectfully, they said 5th and 14th Amendment in their notice of removal. 5th and 14th Amendment was the basis for their jurisdiction. But you brought an equal protection claim. That's right. That's under the 14th Amendment. What does it matter which of several federal claims they point to in the notice of removal? Well, what I was going to. It doesn't matter. It doesn't make any sense. It doesn't matter in as much. It matters in as much as that they didn't contest jurisdiction over the takings claim. They didn't contest that it was unright. They litigated it on the merits. We went through significant discovery in the federal court, answers, motion is dismissed, and they're not raising Williamson County. So we're spending resources with our claim being in federal court, and then they're turning around a year later in summary judgment and saying, oh, but it's not right because they should have been in state court where it was before we removed them. And what we're saying is that's not a reasonable, certain, or fair procedure, and that's what the Constitution requires. It requires some access to the courts for our federal takings claim. But how are we going to get access under this? I mean, I understand you can get remanded, but you're going to get yanked around through procedural attrition. It's just a recipe. So the bottom, what you're really saying is if you join a takings claim with a raft of other constitutional claims, the defendant is put to a choice. The defendant can either stay in state court and litigate everything in state court, or the defendant can remove the case on federal question jurisdiction, and the defendant doesn't then thereafter get to challenge the rightness of the takings claim. No, I'm not saying. I'm not arguing. That seems to be exactly what you're saying. I'm not arguing for a categorical rule. What I'm saying in this case where they removed it and then waited a year. Would 10 months do it? That's if you have significant litigation in those 10 months. But isn't there going to be litigation on the equal protection claim anyway? Well, they are. Isn't there going to be discovery on the equal protection? I mean, that's what you were arguing in the last case. There is going to be discovery on those claims. I'm not denying that. And it doesn't matter whether the takings claim is sitting in federal court for 10 months or 12 months, or it's sitting in state court. Well, it matters a great deal if it's sitting in state court first, but they take it out, and then we're stuck in federal court. What was the basis that the court said your taking claim was not right? What was the basis? The basis, it said that you had to litigate under Williamson County an inverse condemnation action first. Right. State court inverse. You have an argument that the court is wrong not based on 10 months, but based on anything else, or 10 months or a year. I thought you would make an analogy to 11th Amendment immunity. That you can't manipulate, that you plowed it properly, the other side removed you, and then asserted a right they had in state court, but they would lose that right by removing the federal court. Right, and that's a waiver argument, and that's one of the first things I believe I said. You've been talking about 12 months. What does 12 months have to do with this argument? Well, it... It doesn't have anything to do with it, does it? It could have something to do with it, but it doesn't have anything to do under the Lapides argument, the Supreme Court holding that you can't, the government can't take a case into federal court and then argue a state, you should be in state court argument after that because it's procedural gamesmanship and it's not going to be allowed. So, no, that doesn't matter. The timing on that doesn't matter at all for the waiver argument. Let me ask you this, if the district court were wrong on the rightness argument, so you would say you have to keep the taking claim is right, correct? Correct. Why couldn't the district court stay it? Stay the federal takings claim? Yep. And it would stay, it would have to bring up the inverse condemnation claim back as well because those claims have to be litigated together. I didn't say that. I don't know who says that. Well, if you would have the same issue of a stay, I guess you would have to, on what basis and for what, I would get, I would, what would be the... The court decides under the law it stays it for a lot of different reasons. I'm not sure I would, I'm not sure I understand what basis, what it would be staying it for and I'm not sure under what legal... You might be staying it to see what happens in the inverse condemnation case. Oh, I understand. Well, if that happened, then we would lose our federal takings claim again because what would happen, then we'd run into claim or issue preclusion. So, there's no... No, I'm not so sure about that. I seemed to ask a lawyer in the last case that question. You did, you did ask the lawyer and the lawyer in the last case said that there's a very good chance that we, depending on North Carolina, excuse me, state law, that you would have claim and issue preclusion problems. So, there's a very good chance that if you stayed it to allow in condemnation claim to go forward in state court, you'd have a preclusion issue. The stay wouldn't create that, though, would it? The stay wouldn't create that, that would be created by the fact that you... That's the normal procedure of the inverse condemnation case going forward. Well, I guess... It isn't under the normal course in state law, isn't that what's going to happen? It doesn't, I'm just wondering, under takings claim in state court, wouldn't the inverse condemnation case have to be decided first? It's not always clear, but yes, generally, that appears to be how you're supposed to do it. Because if you got fair market value, something the claimant agreed was fair market value... Then you don't have a takings claim. Then there's no takings claim. And that's one possibility, but you don't know how these things are going to come out. But wait, but wait, but wait. But doesn't that sort of make perfect sense for a court to use a stay? For a court to go, there's several issues in this litigation. This one is dependent on that one. Let's do that one first, and I'll stay this one. Doesn't that seem to make sense? That's one possibility, and I would just say if you have... To have that inverse condemnation claim be in the federal court and have it do both as well. Wait, you'd have to convince the district court of that. Okay. But I'm talking about the district court's right. If the court's wrong on rightness because of the sort of waiver issue, the court could stay it. Well, I guess, and that's one possibility, but we have a due process claim here, too, that wouldn't have any option for a stay. We were denied a hearing before or after this removal order, and we were deprived of our property interest. This isn't a normal nuisance order. I want to make that clear. This isn't like the government coming to you and saying, oh, you've got trash on your yard or your house is in disrepair. We'll give you 30 days to fix it. There's no deprivation of property in that instance, but that isn't our case. We have an order saying your home has to go, be removed, or be demolished in 15 days. There's no chance for you to cure it. We're not going to give you any permits, and you're going to be fine, and we can come out and demolish the thing in 15 days. That's what it says. And in that case, we have a deprivation because we have a loss of a right to use, a loss of a right to rent, loss of a market. Let me ask you this much. Did the town go to court in Derrick County and ask for an order saying your client's house created a nuisance? No. It didn't? In the Telosco case, it did. In this case, we sued after we realized we couldn't get any permits. There's a categorical permit ban on Kama permits. Right after this nuisance order, the town issued a policy to all its employees saying don't issue any permits to these homes, including Kama permits. It then, four months later, says it changed it, but it didn't give us any notice, so we still didn't know there was any permits left. Well, absent a court abatement order, though, attempting to enforce the nuisance notice, what's the harm that requires a hearing? Well, the harm is that, again, it's not a normal abatement order where you have a chance to cure. You have an immediate effect. Just as in Connecticut v. Dorr, where there was an attachment, and that was considered significant enough because it clouded your title. Wouldn't a court proceeding, the court abatement proceeding, provide that opportunity for you to argue that point? A court proceeding wouldn't be sufficient for due process. No post-deprivation state remedy is going to be sufficient for procedure due process because this is an official policy that the town is acting under, and it clearly could have provided pre-deprivation process. It used to provide notice and hearing before it ordered homes removed on public trust ground, and it stopped doing that. But if it's a policy that it's not enforcing via the judicial process, how are you being deprived of anything? Well, we're being deprived because we're losing our right to market our property. Our value plummeted after the order. It was the order that did this because it doesn't give us any chance to cure. We got nothing. We can't get permits. We got to remove our home. We're being fined every day to remove it, so we don't have traditional property. What can we do with the property? Nothing. So that's a deprivation that triggers due process. You can't sell the property? No, not under those circumstances. Why? No, no, no. Is something the state's done legally keeping you from selling the property? The order is keeping us from selling property. No, it's not. Why is that? You mean the order says you may not sell this property? No, but the effect is that. Wait a minute now. No, no, no. Wait a minute now. They're not keeping you. Somebody could buy that property from you, couldn't they? For zero. I mean, there's no value. No, they could buy it from you. They could offer you more money than that if they want to. Right, but the value is zero, so it's hard to market a valueless property. But why? Is the value at zero because of the order from the town? Because they're claiming that we're on, wrongly claiming that we're on public land, and our home has to go, and there's nothing we can do about it. The order didn't say we're just only going to go to court. I know that's what they're saying now. That's not what it said. It said remove your home or demolish it, and we are not going to issue any permits for this except for demolishment. And if you don't, employees can come out in 15 days and remove it yourself. That's what the order said. There's nothing you can do with that property. So if an attachment is a sufficient deprivation of property, then surely an order saying you have to remove and there's nothing you can do with your property has got to be sufficient for due process. And that's what we're claiming. On the post-deprivation remedies, again, they don't contest that a hearing could have been provided. They don't contest that they had to rush and do this order. All we're asking for is that property owners get a hearing before this happens. There are other property owners, other rows of property. If their theory, if they continue with the theory that the vegetation line, every time it moves, that every house that comes in front of it is just useless and it's their land and they can do what they want, those people are going to need a hearing too to discuss the factual basis for these determinations, which maybe some of this could have been avoided. We could have asked why they're going after some people and not others. We could have asked them about and discussed the basis for their determination. They don't have mean high tide line determinations. So as a practical matter, there's nothing wrong or hard about giving a hearing. It's not a burden on the town. They don't claim it. They just say they don't want to. They just want to come to court and say, well, that's good enough. You get to sue us. That's your due process. The Constitution doesn't. That's not sufficient for the Constitution. We need to have some kind of hearing either before or right after the order, administrative hearing, where we can sit down with them. It doesn't have to be, I'm not saying it has to be evidentiary hearing, but somewhere we can contest the basis for these orders. And other people are lining up, and they're going to be in the same position as us, and their due process will be you have to sue in court. And I don't think that's satisfactory for the Constitution. I'll stop right there. You reserve some time. Thank you very much. Mr. Gallup. Thank you, Your Honor. May it please the Court. My name is Ben Gallup. My partner, John Leidy, and I represent defendant appellate town of Nags Head. I'm going to cover the rightness question on the regulatory takings claim, and Mr. Leidy is going to deal with due process and equal protection. But I wanted to hit a couple things based on the Tlaxo arguments and the arguments here. I'm sorry. Why do we have two different law firms here? Is it insurance coverage? No, Your Honor. It's a conflict issue. We had represented Mr. Tlaxo previously. I see. We're the primary counsel for the town of Nags Head. And one of the things I wanted to get into, Mr. Bremer points out that they filed this suit. Well, the town of Nags Head went through a process. It sent notices. It sent these letters. All they are is notices. You are a nuisance. Mr. Leidy will tell you. Whoa, whoa, whoa, whoa. Do they say we're going to tell your house down in 15 days? Actually, I don't think it says that. I think it says we may take action to do it ourselves in 15 days. So wait, wait, wait, wait, wait. It was just an innocuous good-to-see-your-neighbor-letting-you-know-some-problems-we're-going-to-work-through-it-with-you. What town do you work for that does that? We work for a very good town. I suspect you say that. They don't ever say. They don't say. Is it in the record? You're going to stand by. It's easy to solve. The notice says you have 15 days to correct it or we are authorized to take your house down. I believe it says we may. And I think it says we reserve our rights, including the right to file a suit. So in other words, you gave notice that they don't do something in 15 days. They were at risk that you were going to take it down. They were at risk, and they were at risk that we were going to do something. But the actual facts in the record show that Mr. Ogburn, who is here, the town manager, and the mayor met with Mr. Sentosa. And they told him, we're not going to take it down without a court order. There were letters exchanged between their lawyers in the first month because there are some other sideline issues about what occurred on November 12th. Don't get into it unless it's in the record. Well, no, that's in the record as well. Those letters are in the record. But the record, the letters from us to their attorneys in December or is it January, sometime in that time frame, say, we're not going to do anything without filing a suit. They knew that. So through the early winter, springtime, we started filing suits. There were 22 other properties and four other properties earlier in 2009 due to other storms. We started filing suits in April. For the purpose of? Of enforcing the nuisance ordinance. We just hadn't gotten to Mr. Sentosa. Repair or remove? Is that essentially it? Or were they all removed? All of these were, the remedy, Salt, was removal. Removal. Removal. They were all similarly situated to the San Soto cottages. They were all far. Actually, the San Soto cottages are the farthest out on the beach. But they were all much farther than some of the ones that Mr. Bremer has mentioned. So the suit said, we want them removed. Yes. Okay. Go ahead. I don't remember the exact request and the relief, but essentially it was we wanted them removed. And as with Tilak, so when the nourishment came around, we changed that. And we dropped the part about the location and asked purely for repairs. And those haven't occurred. Can I ask you about that? I don't want to consume much of your time, but where did the nourishment plan come from? Why would the town have jumped through all these hoops between the end of 2009 and the end of 2010? Surely somebody must have known. They were about to spend $30 million to enlarge the beach by 200 feet. The interesting thing is the town was on the wrong side of the government in that issue. The wrong side? The town is the government? No, not the federal government. And it's not the state government. The town had been seeking permits, trying to do this nourishment project through various different means, different taxing structures, all sorts of things for 10 to 15 years. And it was a pipe dream. They kept getting no. They kept getting no, no, no. And it wasn't until April 2011 that it actually was, oh my gosh, we're going to do this this summer. Well after, you know, we thought we were going to be having to deal with this as it went around. So this was sort of manna from heaven that this $30 million showed up? Well, that was tax revenue through a special tax district, which I don't believe the Sans Sotos or Tlaxo ever paid for because that valuation of Z, that was one other thing I wanted to point out. There is no evidence in the record. Did you notice if they didn't straighten up, you were going to take the sand from in front of their house? No. But the point is this. The money comes from accommodations tax or something like that? No, the money comes primarily from a special district. It's not particular. I just wondered. But the point is you were surprised that all the other parties that could veto or would have some say all lined up to let you do it. Is that the point? To some degree it was a surprise. It was a process. What do you mean it was some degree it was a surprise? It was a process that had been ongoing. I thought you said it was a pipe dream. It was. If it was a pipe dream, that means it's not likely to happen. We just wishful thinking. Well, did something change to make it happen? I just thought maybe the regulatory bodies changed their whatever. You don't care, do you? Were you all surprised that you got approval? I would have to look at Mr. Ogburn's affidavit, but I believe that surprise or some similar term is what he used to describe the effect of getting that nourishment. It was not expected. Go to rightness. Go to rightness. What's your argument about rightness? The argument about rightness is there already is a standard. It's a prudential doctrine that has a standard, and the standard is abuse of discretion. There's no need to create a new waiver standard for removal. The question is did Judge Dever abuse his discretion by determining that it was not right? Yes, because if it's right as a matter of law, then he's wrong. Abuse of discretion covers an error of law. Mr. Bremer did not argue in his brief. He said today that this case was right. No. In his brief, he argued that they admitted Williamson applied. They had not gotten a state court judgment, as Holliday and San Remo say, is what you have to do to satisfy Williamson's second prong. I mean, that's where they started. Yeah. You stopped them from doing that. Well, let me tell you why it was a bad policy to make a removal. No, no, no. The point is how didn't they file a lawsuit doing exactly what you say is necessary under the law? No. What I say is necessary is that they should have reserved that claim. They should have taken steps to affirmably protect themselves, particularly in the face of our answer that said you have not exhausted administrative or judicial remedies. Didn't they file? I thought they filed inverse condemnation and takings together. They did. Okay. Separate counts. Did they file separate counts? They did. Takings and inverse condemnation. They did. Okay. They did. They filed separate counts. But isn't that required in state law to file both of them, to proceed on both of them at the same time? I don't believe so. I believe that North Carolina's inverse condemnation claim covers a regulatory taking. The case that Mr. Bremer writes in his reply for the idea that they can be seen at the same time and heard at the same time never mentions regulatory taking. But what it does mention is North Carolina's Chapter 40A encompasses where the inverse condemnation comes from encompasses the federal constitution. It's a claim that is a federal constitutional claim. It's state constitutional, federal constitutional. They're the same. Once you gave them notice that they had failed to exhaust their administrative remedies, what do you say they should have done? They should have asked to stay. They should have asked to abstain. They should have asked for a remand. But they took, if you look at this from a fairness perspective, they've looked at this from a fairness perspective. They're the ones that didn't do anything. They didn't seek an England reservation in the lower court. One thing that's important. Mr. Bremer is one of the preeminent scholars in this country on this issue. But he brings you no case that really supports his position. And there are plenty of articles that he's written that explain, well, the way to avoid the issue preclusion and all these other things is to try an England reservation, is to try this and that. But yet he argues here today, we can't do that. The district court case said precisely that under these circumstances it would be inequitable not to allow the claims to proceed together in federal court. And effectively that would be reviewed under an abuse of discretion standard. And the judge might not have abused his discretion in that case where it was post-trial. Post-trial. In post-trial motions they said, uh-oh, we lost a bunch of money. We want to go back. And there was nothing to be remanded. In this case, there's no prejudice. Is discovery complete in this case? There were something short of 60 depositions taken in this case. I take that as a yes. Yes, discovery. It's more to complete discovery than I could ever imagine in this case and San Soto too, which I wanted to mention. Very briefly, there are four points of potential takings here that they've actioned.  The adoption of the July 2010 ordinance and the denial of permits. San Soto too, which was not appealed, is a final judgment. And Judge Dever found in both those cases that there was never any application of the July ordinance and that there was never any permit sought except for one house. And that permit was denied as incomplete, not based on anything related to this. So they've never sought a complete permit. And the November 12 actions are not regulatory actions. So the regulatory taking does not relate to them. Thank you. Thank you. Leidy? May it please the Court. I am John Leidy, and I would like to discuss the procedural due process claim first. Can I ask you this before you plunge into your argument? Let me make sure I've got this straight. So where we are today, if I understand it, in both cases, is that we now have 200 feet of beach, right? All these properties, in both cases, can stay where they are as long as they get repaired, septics are repaired, and the town's not interested in defeating anybody's permits. That's correct. So this is like status quo ante almost. This is like we are at a time when, before the November 2009 storm, when everybody was happy and the town's found the $30 million, that's where we are. So in both of these cases, the fights are now over whatever losses these property owners suffered and whatever constitutional or other violations they incurred during the period between the storm and some recent time when the North Carolina Court of Appeals said the town can't even involve itself in the trust beach. Is all of that accurate? Yes, sir. Okay, great. Thank you very much. Yes, sir. Go ahead with your argument. Well, their claim, their takings claim, for the procedural due process purposes, is based entirely on the assumption that the nuisance notification letter was a taking, that it took their interest in the property, the fee simple interest in the property, or that it took their money, or that it deprived them of the ability to obtain permits. And that it deprived them of rental income, for example. They've never pursued that. They claim they lost money. Yes. Value, perhaps, but certainly income during the period when all this stuff was going on. Unfortunately, they've never pursued the rental claim. They have pursued only the loss of value of the property because they contend this was a fee simple taking, took the fee simple interest in the property. Rule 15 would probably permit them to amend or something. So let's assume it's all in there. Okay.  It was a normal nuisance notification. It did tell them simply. Are you dealing with the merits of taking? I'm sorry? Are you dealing with the merits of the taking claim? Because that is not right according to the district court. The district court dismissed the regulatory taking claim. I'm talking separately about the procedural due process claim, which is very similar. It's based on their contention that the letter was a taking of these properties. The procedural due process claim is not a takings claim. Well, it is. In this case, they contend that it is. That they were deprived of property. Yes, sir. That's exactly what they're contending. And as I said, and I think you all talked about this in the prior argument, so I won't harp on it, but essentially that letter didn't take anything from the plaintiffs. It didn't take any money from the plaintiffs. That's one of their contentions. It probably took their peace of mind. It may have taken their peace of mind, but they've kept their money. They haven't paid the town a thing. But they couldn't rent it. Who would rent a property to a family when they've been told? You see? During all inferences in favor of the homeowners, they couldn't rent this property. Again, they've not asserted that claim. And that wasn't before the trial court. Well, I guess they could have rented it for 14 days from the day of the notice. Because after 15, you all could tear it down. Well, I can tell you this. That probably doesn't help the rental market. I think the most important thing is this. They say that this letter deprived them of the ability to get permits as well, which is absolutely false because other people who got the same letter submitted permit applications, and if they met the town ordinance requirement, they received permits. Some cottages received the same letter that were in the same condition. Did you indicate those permits that you didn't want them issued? The permits that the town told them would not be issued, people applied for them and got them because if they met the requirements, the town had to issue them. Did you indicate to the permit-issuing body that in those cases it got them, that the town did not want them to be issued? They were town permits. They were issued by the town. Oh, I see. So the town basically changed its position. And Mr. Sansoda was aware of this. We're talking about a row of, at this point in time, a row of eight cottages, one of which has now been removed in the middle, another one, the Cherry, you've heard about Cherry, that's in the middle, then there's three on one end and three on the other, and the Telosco Cottage is located to the north of the three to the north. But other cottages in other locations applied for and got permits from the town, and Mr. Sansoda was aware of that. And as far as his concern about what might happen with this property, he's admitted in his testimony that he was not concerned that the town would act unilaterally. He didn't think that would happen. I don't think those notices, are you suggesting to the court, I can't put my, you know, where is that notice letter that went out? Where is it in the record? I'm not sure. I suspect the town's making them sound a little more innocuous than I remember reading them. If you don't find it, that's fine. I'm just saying. I don't have my appendix with me, but it's in the first volume. Basically, Mr. Gallup recited it correctly. It did say your house is a nuisance. It violates these provisions of the nuisance ordinance. You must abate the nuisance by removing your cottage, and if you do not, the town may take action to do so. They're not so innocuous sounding, is it? Well, it is. And you take it in context with the state law that requires the town to get a court order before it can act to remove the cottage. And it says on the notice, if you don't do it within 15 days, we're going to go to court to get an order. It doesn't say that. Ah, I bet it doesn't say that. But that's what state law imposes. State law imposes that requirement. I know that, but just let me tell you something. That property owner that gets that notice, a property owner takes it for exactly what your client meant for it to be. Do it, or we're going to tear your house down. You used those words. That's exactly what you meant to convey, wasn't it? I agree. Okay. I agree. I think that's fair enough. And Mr. Sansoda opposed that, as was his right. You don't blame him, do you? And in three years, nothing's happened. You don't blame him for opposing that, do you? Well, I've always considered the cottages to be valueless ever since the storm, so maybe my opinion is different. Can they get insurance? They may be able to get insurance. There may be a problem with some because they've previously had total damage claims submitted and may not be insurable anymore. You mean an insurance company would actually – I mean, I've seen those photographs. An insurance company would actually insure those properties? Federally subsidized insurance program. Oh, flood insurance. Yes, sir. Oh. If I may move on. Well, maybe you could wait until their flood insurance claim ripens. But I guess it won't with that, Sam. Move ahead. I'd like to address that because that's an important point. Mr. Sansoda admitted in a town meeting that he didn't realize that the insurance wasn't going to pay for the loss of the properties just because they were declared a nuisance. And because he didn't know that, he sank pilings 30 feet into the ground to make them impervious to destruction, is what he thinks. So they're not going to be destroyed anytime soon. But they are storm damaged, and that's a separate claim that the town is pursuing, and that one has been remanded to state court. But assuming that the letter could be considered some sort of taking or somehow to have been a violation of their procedural due process rights, that claim is barred by the fact that there is an adequate post-deprivation remedy available in state court through an inverse condemnation claim. The jurisprudence is clear. It's been recited numerous times in this court, first in Yates v. Jamieson. Is there any allowance in that law for a unique property that could not be replaced? Cases have not made that distinction. And I don't see the purpose for that because the point is the remedy for the procedural due process violation, if there is one, is the value of the property that has been taken. The courts have been clear in Yates, in Presley v. City of Charlottesville, and in the Tri-County Paving v. Ashe County. You're saying the law is just fair market value, that's it? Fair market value, and that's the remedy. Anything you assert is unique, you could testify about that and try to get some value. That's correct. And the plaintiff's argument is that there's some sort of separate remedy here, some sort of separate claim for the procedural due process deprivation itself. That's flatly rejected by these cases. And the plaintiffs have cited no case law from the Fourth Circuit that would require any different result. Although they've cited cases from other locations that are similar to that, they're not cases involving the enforcement of a nuisance ordinance. So you would say we would affirm on the procedural due process claim and anything related to that. Yes, sir. But you think that the general takings claim is not right. Oh, yes, that's correct. Absolutely. Finally, on the equal protection, I'd like to move on to that briefly. I'm almost out of my time. The real problem there is they have failed to meet their burden of establishing that there are others similarly situated to their properties. You know, I asked that question. I sort of asked that question. I thought somebody said there were eight cottages that are similarly situated. I think you said that. All the plaintiffs. They're all the plaintiffs. Oh, I see. Oh, I see. Mr. Ogburn declared following the November storm, he declared 22 cottages to be a nuisance. He declared four prior to that. Is that all based on being seaward of the vegetation line? It's based upon being located so close to the waters of the Atlantic Ocean that they impose an obstacle to public use of the beach or that they pose a public safety risk. So was that based on then the water line and not the vegetation line? That's correct. Okay. That's correct. By being seaward of the vegetation line, they are in the public trust area, which makes them subject to the ordinance. But he declared those that were the closest to the water because they posed the greatest obstacles and the greatest risk to public safety. If he had done that based on the vegetation line, then there would be similarly situated. Yes, sir. That's correct. But he had a purpose for why he declared what he declared, and that makes all the difference in the world on the equal protection. He didn't want to make everybody mad at one time. Well, I think the point is what he was trying to enforce was not violated by some of these other properties, regardless of how the fact that they were located either in whole or in part seaward of the vegetation line. It was the location of the ones in issue. You've seen the photos. You've seen how close to the water they are. I'll let you take 10 seconds to wrap up unless there are other questions. I would like to simply point out that contrary to something mentioned in the reply brief, the plaintiffs have waived their other claims, the claim for substantive due process or any other 1983 violations because they've not brought those forward. But we do ask that you affirm the trial court's dismissal of the regulatory taking claim and the procedural due process and equal protection claim. Thank you very much. Thank you very much. Mr. Bramer? Is it true that there's no loss of rental income claim here? Is that correct? I'm having a difficulty here with the microphone. There we go. No, that's not true. It's not true. It's not true. Throughout it, we've claimed. Is that your measure of damages here for the takings claim? For the due process claim, that's one measure of damages. The due process claim and the takings claims are not the same in damages, remedy, or injury. So I'm going to be a little bit more precise than maybe counsel was about specifying. Could you just start with damages? How does your due process claim and your takings claim differ in the measure of damages? For the takings claim, the only damages you can get is just compensation, the fair market value of your fee simple title and it transfers to the government. But they didn't take your fee simple. They deprived you of the use of your fee simple for some period of months. Do you disagree with that? Yes. For the takings claim, they also took our land. But you still own the property. I don't understand this. It's probably my fault. It's probably my fault. But your clients still own the properties. They have fee simple title to the properties. And we're told that they're going to get the permits, they're going to get the approvals, and they're going to be renting those properties this summer if they hurry up and finish it. I guess. I'm missing something here. Their claim is that we have naked, barren, empty title with no rights whatsoever to the land and the home. That's their position. What is the basis for your assertion in that regard? Their town manager's assertion that they already own the land, that the public can do anything it wants on it and we can't do anything except sit or walk on it just like the public can. That's the basis for the assertion. They have no authority to enforce that doctrine. It's the state that ultimately has it. It's a nullity. What the town says about any of that is a nullity. You're correct that now that Cherry says they have no authority to remove their homes, but I don't think I'm hearing them saying that they won't go after the homes on some other basis or don't consider them still to be a problem on the beach. That may be a perspective taking at best, but it doesn't make out a claim for a taking. All right. But the damages, I guess it would be a temporary taking from the time I'm talking about taking not due process. Which is the time use of money, which is rental value. And a temporary taking that would be the sense if they're conceding that the public trust that they can no longer claim our land. That's private property as public property, which I don't think they are. But if they are, then it would only be a use issue. But if they're claiming that the state court has already told them they can't do anything about the public. They've told us they can't. We can't remove. Yeah, they said they can't remove the homes. So, so, so maybe. So, so, you know, I don't want to belabor the point. I guess we could just respectfully disagree. I don't want to consume all of your rebuttal time, but I'm just on the due process claim. You keep talking like they've lost fee simple to the property, and that manifestly is not the case, at least for a temporary period. They did, and they never lost fee simple. Well, I would like to ask them if they consider our beach to be public property or private property. It doesn't matter. They can't enforce the nuisance law. The town, the defendant here, or the plaintiff, in your case, can't enforce the nuisance law based on where it is. They can't remove the homes, but they're not saying that they can't enforce that the public uses in that land, our land. They haven't said that that is our private property like any other private property. That is our claim because it's in. I see. So I see what you're trying to do. It's taken me two hours, but I finally see what you're trying to do. It's behind. Our position is on the North Carolina. You want some federal judge to say your clients own the fee simple in the sand. That's what you want. I didn't understand that before. They agree that we own the fee simple in the sand, that it's private property. Unlike the wet beach, it's private property. It's always been that way. Their claim is just that it's impressed with this type of easement, a public trust easement, and therefore, although it's our private property, we don't have any rights in it, and they can come along at any time and claim the land for use and remove homes, although now that's an issue. And so that's the takings claim that needs to be resolved at the district court. I see. So it's not about the cottage at all. It's about the sand. It's primarily about the cottage. It's not about the cottage. I see that now. Okay. Well, we care a lot about it. They care most about their cottage and not people walking around. They're not walking on the cottage. They're walking on the sand. I know, but if you have the situation where a town claims that that land is public trust property, then you are in a situation where you don't have the normal rights. So there's a threat always that you're not on your own property. Your theory, I think I understand. Your theory is before all this started, we owned that property fee simple with all the appurtenances that went with fee simple ownership. Still do. I said that was your position. Before this, I said, it might help if you listen to what I'm saying. Okay. I'm not challenging what you're saying, but wasn't your position that before any of this happened, you owned that property in fee simple? Yes. You had all the appurtenances and all the rights of fee simple ownership. Now, you've always thought you do, correct? But you're interested in litigation because you think the town is taking a position that that is no longer true and your ownership is not fee simple. It might be some type of ownership, but it's subject to basically a public easement. An easement. Yeah. Right. You're trying to extinguish the easement here. And I'm sorry I jumped in. It's subject to an easement, but it's an easement which strips you of all your rights. It's not like an accommodating easement where the public has a right. But I didn't say that. But I didn't say that. I'm just laying out what the case is. That you think by their actions and their intentions, they indicated to your clients that we believe as a matter of law, we have the authority, and we're converting whatever it is you own from fee simple. It won't be that anymore. Right. It'll be something else. And you say that was the taking. So now we're at this point after the state law decisions, everybody seems to agree, the town, they don't have to change their position about what public trust property means. It's just they don't have the authority to enforce their definition on you. Is that correct? Right. And so then I guess it would just be a damages, a temporary damages thing. But again, you would have a different situation where it's hard to measure what that is. Now, for a constitutional deprivation, I understand if they did it, you would get at least a dollar, I guess, in attorney's fees. Well, for procedural due process, you could get nominal damage, not for takings claim, though. I'm talking about for equal protection and due process challenges if there's a constitutional violation. There would be at least nominal damages plus possibility of attorney's fees, right? Nominal damage plus possibility of a declaration and an injunction. I don't think that everything is mooted because they continue to claim that they have the right. What would be the injunction? To stop them from asserting that our land is their land, public trust. That would really be a declaratory, not an injunction. Right. I'm sorry. You want a declaration. An injunction based on that, an injunction preventing them from converting or defining our property. By the way, you may have won a battle on the town not being able to enforce their concept of public trust, but you're still at risk of the state enforcing that on you. Isn't that right? Yes, because the state is the only one that has the authority to do that, right? But your damages, even if you're right under that taking, it might not even be the rental value. It might be it's a diminution in value between fee simple and what they said you had for some short period of time. That's right. That's nothing, isn't it? Well, calculating temporary, I'll say takings this time. Calculating temporary takings damages, there's several ways to do that, and frankly we haven't gotten into how exactly we're going to do that, but you have a loss of value between that time and you have a loss of rental income time. Those are both two ways of doing it. How do you measure that? Excuse me? What's the loss between having fee simple and I guess it would be like a temporary clouding of title? Or an imposition of an easement, and I don't know. You do it like any other way. You get an expert on there. But if that didn't mean anything, for instance, if the public didn't know that they had that implied easement across your property, how would that affect your value at all? Well, it's going to affect your value any time you have an easement. That's why encumbrance is when you – That's if people don't know it. Excuse me? If people don't know it. If people don't – the people – the rest of – I bet most of the people in North Carolina had no idea Nags Head was claiming they had a public easement through your property. I mean, what damages do you have? You didn't – you weren't affected by any damages, were you? We lost complete value. I know your feelings were hurt and they scared you. I understand that. I don't think that's unreasonable, quite frankly. We have appraisers showing that we have zero value in our property after the order saying that it's public land and we can remove our health. So for a period of time, there was no value in those – But how did that damage you? That damages us because we can't – it damages our ability to have people come in and rent it. Did you try to do it? Did we try to do what? Rent it during that period of time. There's nothing to rent. It's useless. There's no utilities. There's no – it's been damaged. They won't let us repair it. You know, they say on the permits that they gave other permits. When? Where? Is there a site in the record? Who? When did this happen? They had a four-month categorical permit ban to all their employees. No permits shall be issued. How can we rent in that circumstance? Do you have anything else? My time is – We've run you over. We thank you very much. Appreciate your advocacy on both sides here. I have the clerk adjourn the court and we'll step down to great counsel. This honorable court stands adjourned, sign and die. God save the United States and this honorable court.
judges: Dennis W. Shedd, Andre M. Davis, Albert Diaz